METROPOLITAN LIFE INSURANCE COMPANY *v.*
AETNA CASUALTY AND SURETY
COMPANY ET AL.
(SC 16205)
(SC 16206)
(SC 16207)

Norcott, Katz, Palmer, Vertefeuille and Spear, Js.

(1980); *State* v. *Waller*, 223 Conn. 283, 292, 612 A.2d 1189 (1992); *State* v. *Federici*, 179 Conn. 46, 54–55, 425 A.2d 916 (1979).

Argued September 26, 2000—officially released February 6, 2001

*Francis J. Brady*, with whom were *Randy K. Paar*, pro hac vice, *Wesley W. Horton*, and, on the brief, *Everett E. Newton, Jerold Oshinsky*, pro hac vice, *Eugene R. Anderson*, pro hac vice, and *Mark Garbowski*, pro hac vice, for the appellant (plaintiff).

*Thomas J. Groark, Jr.*, with whom was *Kathleen D. Monnes*, for the appellees (defendant Travelers Casualty and Surety Company et al.).

*Stephen A. Fennell*, pro hac vice, with whom were *John B. Farley* and, on the brief, *Charles G. Cole*, pro hac vice, *Brian J. Leske*, pro hac vice, *Margaret A. Arnold*, pro hac vice, *Stephen R. Apel*, pro hac vice, *R. Cornelius Danaher, Kathleen F. Munroe, Ralph G. Eddy* and *Keith McCabe*, for the appellees (defendant The Home Insurance Company et al.).

*Louis B. Blumenfeld, Laura A. Foggan*, pro hac vice, *Daniel E. Troy*, pro hac vice, and *Keith U. Kuder*, pro hac vice, filed a brief for the Insurance Environmental Litigation Association as amicus curiae.

*Opinion*

KATZ, J. This appeal requires us to determine the scope and meaning of the "per occurrence" limit of liability under certain excess insurance policies issued by the defendant insurers[1] to the plaintiff, Metropolitan Life Insurance Company (Metropolitan). In particular, we must determine whether, under the circumstances of this case, there was one occurrence under the policies, namely, Metropolitan's alleged failure to warn of the dangers of asbestos exposure, which resulted in bodily injury to the underlying claimants, or whether each claimant's exposure was a separate occurrence. The trial court rendered summary judgment in favor of all of the defendants, concluding that each claimant's exposure to asbestos was a separate occurrence. Because we agree that there are multiple occurrences in this case, we affirm the judgment of the trial court.

The trial court found the following facts. "Metropolitan . . . is a large mutual insurance company that insured employee health care plans of various manufacturers and distributors of asbestos and products containing asbestos. . . . Beginning in the 1970s and continuing to the present time, [Metropolitan] has been named as a defendant in thousands of lawsuits filed

---

[1] The original defendants in this case were Aetna Casualty and Surety Company, Allianz Insurance Company, Allianz Underwriters Insurance Company, Arkwright Mutual Insurance Company, Hartford Accident and Indemnity Company, New England Insurance Company, New England Reinsurance Company, Commercial Union Insurance Company, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, Royal Indemnity Company, American Centennial Insurance Company, Highlands Insurance Company, International Insurance Company, The Continental Insurance Company, Fireman's Fund Insurance Company, Insurance Company of North America, The Home Insurance Company, City Insurance Company, Pacific Employers Insurance Company and Forum Insurance Company. Travelers Casualty and Surety Company (Travelers) subsequently was substituted for Aetna Casualty and Surety Company. References herein to the "defendants" are to all of the insurers collectively. References to various individual defendants, where necessary, are by name.

throughout the United States seeking recovery for asbestos-related bodily injuries resulting from [Metropolitan's] alleged failure to publicize adequately the health risks of asbestos exposure. These underlying claims refer to a period of time beginning in the 1930s when [Metropolitan] engaged in medical research activities. Certain reports and articles were generated either by or under the direction of Dr. Anthony Lanza, [Metropolitan's] assistant medical director.

"To date, approximately 200,000 claims against [Metropolitan] have been filed; half of them have been settled, at a 'nuisance value' averaging about $2500 per claim. The underlying claims themselves basically allege that Dr. Lanza, and therefore [Metropolitan], knew or should have known of the hazards of asbestos exposure through the research activities and failed to warn the public by publication of the results of those studies. There are also claims that [Metropolitan] distorted or misstated the results in various articles and reports. Many of the underlying claimants are industrial, shipyard and construction workers who are not [Metropolitan] policyholders or persons who worked in asbestos plants where [Metropolitan] performed studies. Rather, liability is predicated on the claim that [Metropolitan] assumed a duty to disclose to the general public when it undertook its research on asbestos.

"The underlying claimants allegedly suffered bodily injuries resulting from exposure to asbestos over a period of several years. In paying the settlement sums in addition to its defense costs, [Metropolitan] has expended hundreds of millions of dollars in connection with this litigation and anticipates substantial expenditures in the future." *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, Superior Court, judicial district of New London at Norwich, Complex Litigation Docket, Docket No. X04-CV-95-0115305S (April 16, 1999) (24 Conn. L. Rptr. 381, 381–82).

"From 1976 to 1986, the [defendant Travelers Indemnity Company (Travelers Indemnity)] sold primary, umbrella and first-layer excess comprehensive general liability insurance policies to [Metropolitan]. During the same period, Travelers and the remaining defendants sold excess liability insurance policies to [Metropolitan]. None of the excess liability policies provide coverage for underlying claims unless and until an amount equal to the total annual coverage provided by the underlying [Travelers Indemnity] policies ($25 million) is exhausted." Id., 381.[2]

The following undisputed facts and procedural history are also relevant to this appeal. The defendants' insurance policies "all provide a stated dollar amount of insurance on a 'per occurrence' basis, and are in excess of [the Travelers Indemnity] coverage of $25 million per occurrence." Id., 382. Thus, the defendants' policies are not implicated until Metropolitan exhausts the underlying coverage of $25 million *per occurrence*. In addition, the defendants' policies contain, or incorporate by reference, the following batch clause (hereinafter referred to as the continuous exposure clause) contained in the Travelers Indemnity umbrella insurance policies: " 'The total liability of the company for all damages, including damages for care and loss of services, as the result of any one occurrence shall not exceed the limit of liability stated in the declarations as applicable to "each occurrence." For purposes of determining the limit of the company's liability and the retained limit, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions

---

[2] Metropolitan brought a series of actions in which it sought coverage on its primary and umbrella policies issued by Travelers Indemnity for the asbestos-related claims. In 1993, Metropolitan settled its claims with Travelers Indemnity for $300 million. The settlement terminated all of Travelers Indemnity obligations, including its duties to defend and indemnify Metropolitan. In the present case, Metropolitan is seeking coverage from its excess liability carriers.

shall be considered as arising out of one occurrence.' "[3] Id., 383. The defendants' policies do not define the term "occurrence."

In 1995, Metropolitan brought the present action against the defendants, all excess liability carriers, seeking coverage for the various asbestos related claims. Specifically, Metropolitan sought declaratory relief and damages for breach of contract. In the first count, Metropolitan requested that the court enter a declaratory judgment that: (1) the defendants were liable to pay in full Metropolitan's defense costs and all sums it had paid, or would become legally obligated to pay, as damages with respect to the underlying claims; and (2) Metropolitan was entitled to designate the policy years called upon to provide such payments. In the second count, Metropolitan alleged that the defendants had breached or would breach the contractual obligations set forth in the excess policies.

The defendants filed motions for summary judgment based on various grounds, including: (1) that each underlying claim for which Metropolitan sought coverage from the defendants should be treated as a separate occurrence (exposure to asbestos being the defining event);[4] (2) that the injuries should be allocated on a pro rata basis to all periods in which the injuries or damage took place;[5] (3) that Metropolitan could not

[3] While Metropolitan, and later the trial court, characterized this language as a "batch clause," in actuality, this is not a true batch clause for such a clause applies only in products liability cases. See, e.g., *Diamond Shamrock Chemicals Co.* v. *Aetna Casualty & Surety Co.*, 258 N.J. Super. 167, 246–47, 609 A.2d 440 (App. Div. 1992), cert. denied, 134 N.J. 481, 634 A.2d 528 (1993).

[4] Initially, the defendants Home Insurance Company and City Insurance Company (collectively Home), joined by the defendants American Centennial Insurance Company and Forum Insurance Company, sought summary judgment on the number-of-occurrences issue. After the trial court granted the Home motion for summary judgment, the defendant Fireman's Fund Insurance Company moved for summary judgment on the same theory and the trial court granted that motion, as well.

[5] Sixteen defendants initially sought summary judgment on the allocation of damages claim: Travelers; American Centennial Insurance Company; Hart-

sue for breach of contract because, before the filing of the action, it had failed to tender a claim and the defendants had not disclaimed coverage;[6] and (4) that the professional services exclusion in the policies precluded coverage.[7]

On April 16, 1999, the trial court rendered summary judgment for the defendants on the first two grounds. Id., 387. Applying New York and Connecticut law, the court determined that the occurrence, as that term was used in the subject policies, had been each claimant's exposure to asbestos, and not Metropolitan's alleged failure to publicize adequately the dangers of asbestos exposure. Id., 384. Because the claimants had been exposed to asbestos separately, the trial court concluded that there had been multiple occurrences. Id. The trial court also determined that, because the claimants' injuries had spanned several years and Metropolitan was unable to prove "what portion of injury [had]

ford Accident and Indemnity Company; New England Insurance Company; New England Reinsurance Corporation; Forum Insurance Company; Highlands Insurance Company; International Insurance Company; Royal Indemnity Company; Continental Insurance Company; Home Insurance Company; City Insurance Company; National Union Fire Insurance Company of Pittsburgh, Pennsylvania; Insurance Company of North America; Pacific Employers Insurance Company; and Commercial Union Insurance Company. The trial court granted the motions for summary judgment on the allocation claim and thereafter, three additional defendants, Allianz Insurance Company, Allianz Underwriters Insurance Company and Arkwright Mutual Insurance Company moved for summary judgment on that theory. The trial court subsequently granted that motion.

[6] Eighteen of the defendants initially moved for summary judgment on the breach of contract claim. The trial court granted the motions for summary judgment, and thereafter, the only defendant that had not moved for summary judgment as to that claim, Fireman's Fund Insurance Company, then did so on that theory. The trial court subsequently granted that motion.

[7] The parties all agreed that New York and Connecticut were the only jurisdictions that had colorable interests in the resolution of the issues in this case. They also agreed that, with respect to the issues of allocation, the meaning of the term "occurrence" in the excess liability policies, and the meaning of the "professional services" exclusion, there was no conflict between New York and Connecticut law. Therefore, the trial court did not undertake a choice of law analysis.

occurred during the policy periods," the damages should be allocated on a pro rata basis "to all periods in which injury or damage took place."[8] Id. Thereafter, Metropolitan appealed to the Appellate Court and, pursuant to Practice Book § 65-1 and General Statutes § 51-199, we transferred the appeal to ourselves.

On appeal, Metropolitan claims that the trial court improperly concluded that: (1) each of the claims alleging exposure to asbestos constituted a separate occurrence under the excess liability policies at issue; and (2) Metropolitan's damages should be allocated on a pro rata basis to all periods in which injury or damage took place.[9] Specifically, on the occurrence issue, Metropolitan contends that we must examine the *cause* of its liability in the underlying claims. On that basis, it argues that there is a single occurrence,[10] i.e., its alleged

[8] Based on the first two determinations, the trial court concluded that there was no breach of contract because the defendants had no liability as excess carriers. *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 24 Conn. L. Rptr. 386. The trial court also determined that it therefore did not need to address the additional professional services exclusion arguments. Id. On May 5, 1999, Metropolitan moved for reargument regarding the trial court's April 16, 1999 order. On June 22, 1999, the trial court denied Metropolitan's motion.

[9] Metropolitan also challenges two related trial court rulings. It states: "Following the April 16, 1999 decision, certain defendants filed derivative motions seeking to take advantage of the decision. On June 22, 1999, the trial court granted summary judgment to Fireman's Fund Insurance Company . . . on the occurrence and breach of contract issues. On July 1, 1999, the trial court allowed [the] defendants Allianz Insurance Company, Allianz Underwriters Insurance Company, and [Arkwright Mutual Insurance Company] to amend an earlier pleading so as to join the allocation motion after it had been granted. By articulation rulings filed January 4, 2000, the trial court made clear that the reasoning of the April 16 decision applied to both the June 22 and July 1 rulings." See footnotes 4 and 5 of this opinion. Because we conclude that there were multiple occurrences in this case and therefore that, the defendants' policies are not implicated, we do not reach the allocation of damages claim.

[10] Because the provisions of the excess policies limit the damages to those in excess of $25 million per occurrence, the determination of the number of occurrences is critical to the possibility of recovery by Metropolitan. If there is a single occurrence as a matter of law, Metropolitan may aggregate its liability payments on the underlying asbestos claims, thereby reaching

failure to warn of the health risks of asbestos exposure. Given this "common cause," and the continuous exposure clause in the policies, Metropolitan seeks a determination of a single occurrence as a matter of law. The defendants dispute Metropolitan's claims and argue additionally that, with regard to the allocation of damages count, they had not breached their contracts with Metropolitan, and that consequently, summary judgment was proper.[11]

The principal issue in this appeal is "whether an omission, i.e., an alleged failure to publicize adequately the dangers of asbestos exposure, which began at some point in the 1930s and continues to the present time, can be considered a single occurrence for purposes of coverage under the excess liability policies. Under [Metropolitan's] theory, the bodily injuries suffered by the claimants [arose] out of the continuous or repeated exposure to substantially the same general conditions [the failure to warn over a sixty year period] . . . . Thus, in accordance with the [continuous exposure clause] in the policies, [Metropolitan] claims there is but one occurrence." (Internal quotation marks omitted.) Id. Because the total damages sustained by the underlying claimants for Metropolitan's alleged failure to warn exceed $25 million, Metropolitan contends that the defendants' excess policies are triggered. Id., 383. Under the defendants' theory, "each underlying claim for which [Metropolitan] seeks coverage . . . must be treated as a new and separate occurrence. They maintain that the exposure to asbestos is the defining event, i.e., the last link or act in the causal chain . . . ." Id. The defendants assert that "[o]n that basis, [Metropolitan] has not and will not incur sufficient liability on a

the $25 million threshold. If, however, there are multiple occurrences, Metropolitan cannot aggregate the payments and thus, it will not reach the $25 million per occurrence threshold.

[11] Because we conclude that there were multiple occurrences in this case, we do not reach the breach of contract claim.

'per occurrence' basis to implicate any of the defendants' policies." Id.

We conclude that the occurrence in this case is each claimant's initial exposure to asbestos, rather than Metropolitan's alleged failure to warn. We therefore agree with the trial court that there are multiple occurrences in this case. In addition, we also conclude that the continuous exposure clause in the defendants' policies serves to combine claims arising from exposure to asbestos at the same place at roughly the same time into one occurrence,[12] not to combine hundreds of thousands of exposures at different times and locations into one occurrence. Thus, despite the continuous exposure clause, there are still several occurrences in this case. Our conclusion is based on both the wording of the policies, and the interpretation of the word "occurrence" under New York and Connecticut law.

I

## THE LANGUAGE OF THE POLICIES

"[A]n insurance policy is a contract that is construed to effectuate the intent of the parties as expressed by their words and purposes. See *American Home Prods. Corp.* v. *Liberty Mut. Ins. Co.*, 565 F. Supp. 1485, 1492 (S.D.N.Y. 1983), aff'd as modified, 748 F.2d 760 (2d Cir. 1984). [U]nambiguous terms are to be given their plain and ordinary meaning. *State of New York* v. *Blank*, 27 F.3d 783, 792 (2d Cir. 1994). As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. *Haber* v. *St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir. 1998) . . . . The determination of whether an insurance policy is ambiguous is a matter of law for

---

[12] Metropolitan has made no attempt to argue this application of the continuous exposure clause and therefore does not claim that, under this application, it would reach the $25 million per occurrence threshold, thereby implicating the defendants' policies.

the court to decide. See *Alexander & Alexander Servs., Inc.* v. *These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998).

"If the policy is ambiguous, extrinsic evidence may be introduced to support a particular interpretation. *Kinek* v. *Paramount Communications, Inc.*, 22 F.3d 503, 509 (2d Cir. 1994). If the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact. See *Uniroyal, Inc.* v. *Home Ins. Co.*, 707 F. Supp. 1368, 1374–75 (E.D.N.Y. 1988).

"Ordinarily, if an ambiguity arises that cannot be resolved by examining the parties' intentions . . . the ambiguous language should be construed in accordance with the reasonable expectations of the insured when he entered into the contract. *Haber* [v. *St. Paul Guardian Ins. Co.*, supra, 137 F.3d 697]. Courts in such situations often apply the contra proferentem rule and interpret a policy against the insurer. See, e.g., *Westchester Resco Co.* v. *New England Reins. Corp.*, 818 F.2d 2, 3 (2d Cir. 1987) (per curiam)." (Internal quotation marks omitted.) *Dicola* v. *American Steamship Owners Mutual Protection & Indemnity Assn., Inc.*, 158 F.3d 65, 77 (2d Cir. 1998) (*In re Prudential Lines, Inc.*). The contra-insurer rule does not apply, however, in actions by one insurer against another. Id.; see also *United States Fire Ins. Co.* v. *General Reinsurance Corp.*, 949 F.2d 569, 573–74 (2d Cir. 1991) (dispute between two insurance companies); *Loblaw, Inc.* v. *Employers' Liability Assurance Corp., Ltd.*, 85 App. Div. 2d 880, 881, 446 N.Y.S.2d 743 (1981) (dispute between self-insured entity and excess insurer), aff'd, 57 N.Y.2d 872, 442 N.E.2d 438, 456 N.Y.S.2d 40 (1982).

In the present case, the defendants' insurance policies are not ambiguous. Although the term occurrence is not defined in the policies, the Second Circuit Court

of Appeals, applying New York law consistently has held that it is unambiguous.[13] See *In re Prudential Lines, Inc.*, supra, 158 F.3d 76–79 (concluding "occurrence" unambiguous despite lack of definition in policy); *Stonewall Ins. Co.* v. *Asbestos Claims Management Corp.*, 73 F.3d 1178, 1214 (2d Cir. 1995) (concluding "per occurrence" deductible provision not ambiguous), reh. denied, 85 F.3d 49 (2d Cir. 1996); see also *Arthur A. Johnson Corp.* v. *Indemnity Ins. Co. of North America*, 7 N.Y.2d 222, 227, 164 N.E.2d 704, 196 N.Y.S.2d 678 (1959) (concluding "accident" not ambiguous).[14] In *In re Prudential Lines, Inc.*, supra, 76, the court, quoting *Newmont Mines Ltd.* v. *Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986), noted that " 'the word "occurrence" ordinarily is understood to denote "something that takes place," especially "something that happens unexpectedly without design." ' " See Webster's Third New International Dictionary (1986); see also *Arthur A. Johnson Corp.* v. *Indemnity Ins. Co. of North America*, supra, 228 (defining "accident" as "an event of unfortunate character that takes place without one's foresight or expectation. . . . That is, an unexpected, unfortunate occurrence." [Citation omitted; internal quotation marks omitted.]). In *In re Prudential Lines, Inc.*, supra, 79, the court rejected the claimant's contention that the presence of asbestos aboard a ship constituted an occurrence under the

[13] Even if the term occurrence were ambiguous, Metropolitan cannot rely on the contra proferentum rule, which is applicable only where there *is* an ambiguity, because "the contra-insurer rule does not apply in actions by one insurer against another . . . ." (Citations omitted.) *In re Prudential Lines, Inc.*, supra, 158 F.3d 77.

[14] In the context in which they are used in this case, the words "accident" and "occurrence" are synonymous. Past cases have used the words interchangeably and we see no reason to treat the terms differently in connection with this case. See *In re Prudential Lines, Inc.*, supra, 158 F.3d 79–80; *Stonewall Ins. Co.* v. *Asbestos Claims Management Corp.*, supra, 73 F.3d 1213–14; *Hartford Accident & Indemnity Co.* v. *Wesolowski*, 33 N.Y.2d 169, 172–73, 305 N.E.2d 907, 350 N.Y.S.2d 895 (1973).

deductible provision of an insurance policy, concluding that such an interpretation was "inconsistent with the plain and ordinary meaning" of the word. The court reasoned therein: "The presence of asbestos aboard a vessel cannot be said to take place, any more than in a slip and fall aboard a ship the slippery deck can be said to be happening. The presence of asbestos aboard a ship is a condition that from the point of view of the ship, is in some respects a benefit. The unfortunate event causing personal injury [and thus the occurrence under the policy] is the exposure of people."[15] Id.

The per occurrence language is also unambiguous as it is used in the continuous exposure clause. Under the plain and ordinary meaning of the policy, the continuous exposure clause combines claims arising from each claimant's *exposure* to asbestos at the same place at approximately the same time into one occurrence. It does not, as Metropolitan contends, combine into one occurrence, hundreds of thousands of asbestos-related bodily injury claims arising from Metropolitan's alleged failure to warn.[16] Indeed, Metropolitan makes no

---

[15] In the present case, it is inconsistent with the plain and ordinary meaning of the term occurrence to characterize Metropolitan's failure to warn as an event "that [took] place . . . unexpectedly and without design." (Internal quotation marks omitted.) *In re Prudential Lines, Inc.*, supra, 158 F.3d 79. Metropolitan's alleged inactivity spanned a period of sixty years, and thus, it is more easily characterized as a pattern of behavior or conduct that was conscious on its part. In this case, as in *In re Prudential Lines, Inc.*, there was never any event that "[took] place . . . unexpectedly and without design" until the claimants were exposed to asbestos. Id.

[16] In its brief, Metropolitan initially maintained that the claimants' underlying asbestos-related bodily injury claims arose from *one* occurrence, namely, Metropolitan's alleged failure to warn. Metropolitan, however, later argued in its brief that the effect of the continuous exposure clause is to combine the underlying claims into one occurrence, thus implying that, in the absence of the continuous exposure clause, there would have been several occurrences. Metropolitan never clarified, however, whether the continuous exposure clause aggregates *several* of its alleged failures to warn into one occurrence, or whether it combines hundreds of thousands of *exposures* to asbestos into one occurrence. If Metropolitan is arguing the latter, it has conceded that the occurrence, as that term is used in the defendants' policies, is in fact, each claimant's exposure to asbestos. Thus, for purposes of

attempt to explain how the plain language of the clause could apply to the facts of this case if the occurrence had been, in fact, its failure to warn.

The Travelers Indemnity policy, which uses language similar to the other defendant insurers' policies, provides: "For purposes of determining the limit of the company's liability and the retained limit, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." Under Metropolitan's reasoning, we would have to conclude that the claimants' injuries arose from a "continuous or repeated exposure to" an alleged failure to warn. This is contrary to the ordinary meaning of the policy. *Arthur A. Johnson Corp.* v. *Indemnity Ins. Co. of North America*, supra, 7 N.Y.2d 227 (noting that "accident" must be construed as "the ordinary man on the street or ordinary person when he purchases and pays for insurance" would construe it); *Hertz Corp.* v. *Federal Ins. Co.*, 245 Conn. 374, 381–82, 713 A.2d 820 (1998) (noting that policy language must be given its natural and ordinary meaning). Here, under the plain reading of the policies, it is evident that the claimants' injuries arose from a "continuous or repeated exposure to" asbestos, and not Metropolitan's alleged failure to warn.[17] See *H. E. Butt Grocery Co.* v. *National Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 150 F.3d 526, 533 (5th Cir. 1998) (applying language of nearly identical continuous exposure clause; con-

---

this appeal, we are assuming that Metropolitan is arguing that the clause combines multiple failures to warn. For reasons expressed later in this opinion, however, claims resulting from substantially similar *conduct* cannot be aggregated into one occurrence under a continuous exposure clause.

[17] As several courts have concluded, the exposure to asbestos is the *condition* that creates liability for bodily injury. See *In re Prudential Lines, Inc.*, supra, 158 F.3d 81; *Babcock & Wilcox Co.* v. *Arkwright-Boston Mfg. Mutual Ins. Co.*, 53 F.3d 762, 767–68 (6th Cir. 1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 973, 133 L. Ed. 2d 893 (1996).

cluding claimant was exposed to pedophilic employee, not to insured's negligent supervision of that employee). The trial court recognized this point when it stated that "[i]t is difficult to characterize [Metropolitan's] pattern of behavior or conduct or inactivity as [a] . . . 'condition' which constitutes a single occurrence." *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 24 Conn. L. Rptr. 384. Moreover, the claimants' injuries in this case arose from exposures to asbestos at several locations, at different times, and for varying lengths of time. These circumstances clearly do not constitute "the same general conditions . . . ."[18] Thus, as a plain reading of the policies shows, the continuous exposure clause does not combine hundreds of thousands of exposures to asbestos into one occurrence.

Metropolitan's argument regarding the continuous exposure clause is essentially that all related claims emanating from substantially the same *conduct*, that is, Metropolitan's alleged failure to warn, should be aggregated into a single occurrence. The policy, however, provides that "bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general *conditions* shall be considered as arising out of one occurrence." (Emphasis added.) The policy is silent as to aggregation of claims based solely on similar conduct. Indeed, several courts have rejected the theory that a continuous exposure clause permits aggregation of claims based on similar conduct. See, e.g., *H. E. Butt Grocery Co.* v. *National Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, supra,

---

[18] Under the plain language of the defendants' policies, it is clear that claimants who had been exposed to asbestos at the same location, at roughly the same time, would have been exposed to the same general condition. See *Champion International Corp.* v. *Continental Casualty Co.*, 546 F.2d 502, 508 (2d Cir. 1976) (Newman, J., dissenting), cert. denied, 434 U.S. 819, 98 S. Ct. 59, 54 L. Ed. 2d 75 (1977) (noting that continuous exposure clause combines claims arising from "continuous or repeated exposure to conditions existing at or emanating from *one location*" [emphasis in original]).

150 F.3d 533 (concluding that continuous exposure clause did not combine two sexual assaults on two different children into one occurrence, despite fact that they were predicated on employer's negligence in overseeing pedophilic employee; each assault was separate occurrence); *Michigan Chemical Corp.* v. *American Home Assurance Co.*, 728 F.2d 374, 383 (6th Cir. 1984) (concluding that insured's abstract act of negligence, namely, its possession of contaminated livestock feed, did not combine each sale of feed into one occurrence under continuous exposure clause); *American Red Cross* v. *Travelers Indemnity Co. of Rhode Island*, 816 F. Sup. 755, 761 (D.D.C. 1993) (concluding that despite continuous exposure clause in defendant's insurance policy, plaintiff's "general, negligent practice in handling HIV-contaminated blood" could not be considered one occurrence; determining that each distribution of contaminated blood was separate occurrence).

Finally, it is important to note that the purpose of a continuous exposure clause is to combine claims that occur "when people or property are physically exposed to some injurious phenomenon such as heat, moisture, or radiation . . . [at] *one location.*" (Emphasis in original.) *Champion International Corp.* v. *Continental Casualty Co.*, 546 F.2d 502, 507–508 (2d Cir. 1976) (Newman, J., dissenting), cert. denied, 434 U.S. 819, 98 S. Ct. 59, 54 L. Ed. 2d 75 (1977). "The clause simply broadens . . . 'occurrence' beyond the word 'accident' to include a situation where damage occurs (continuously or repeatedly) over a period of time, rather than instantly, as the word 'accident' usually connotes." Id. The continuous exposure clause has doubtful application in a situation such as the present case, wherein Metropolitan claims that the occurrence was its alleged failure to warn, rather than the claimants' exposure to asbestos, and where it is attempting to combine hundreds of thousands of claims for bodily injury that have occurred

in several locations, spanning six decades. As noted previously, an application of the continuous exposure clause to an allegation of negligent failure to warn places "considerable strain on the words 'exposure' and 'conditions.'" Id., 508. Such an interpretation is inconsistent with the purpose of the clause.

We conclude that the language of the defendants' insurance policies is not ambiguous. A plain reading of the policies indicates that the occurrence in this case was the exposure of the claimants to asbestos, not Metropolitan's alleged failure to warn. Moreover, the proper interpretation of the continuous exposure clause is that it combines exposures to asbestos that occurred at the same place, at approximately the same time, resulting *still*, in multiple occurrences under the policy. The clause cannot be read plausibly, as Metropolitan contends, to combine hundreds of thousands of exposures that occurred under different circumstances throughout the country over a period of sixty years, into one occurrence. As we have explained, such an interpretation is inconsistent with the plain language of the policy and the purpose of a continuous exposure clause.

## II

## CASE LAW

The number of occurrences issue is of critical importance to the parties in this case because the defendants' excess policies are not implicated until Metropolitan exhausts the underlying coverage limits provided in the various Travelers Indemnity policies; the Travelers Indemnity policies insured layers of coverage up to $25 million for *each occurrence*. Metropolitan requests a finding that there was but one occurrence, namely, its negligent failure to warn, for which it was liable in the claimants' underlying suits. Under this view, the defendants' excess policies would be triggered. The

defendants request a finding that each claimant's initial[19] exposure to asbestos was a separate occurrence. Under this theory, the defendants' excess policies would not be implicated. As stated previously, the plain language of the defendants' policies clearly supports their position. In addition, we are persuaded that, even if the policies were ambiguous on this issue, New York law mandates that the defendants' multiple occurrence position is the correct interpretation of the policies.

In identifying the occurrence or occurrences for insurance purposes, courts have applied three tests. See generally annot., 64 A.L.R.4th 668 (1988). Some courts have concluded that an occurrence is determined by reference to the underlying cause or causes of the damage. See, e.g., *Appalachian Ins. Co.* v. *Liberty Mutual Ins. Co.*, 676 F.2d 56, 61 (3d Cir. 1982); *Air Products & Chemicals, Inc.* v. *Hartford Accident & Indemnity Co.*, 707 F. Sup. 762, 772 (E.D. Penn. 1989), aff'd in part, vacated in part on other grounds, 25 F.3d 177 (3d Cir. 1994); *Owens-Illinois, Inc.* v. *Aetna Casualty & Surety Co.*, 597 F. Sup. 1515, 1525 (D.D.C. 1984). Other courts have concluded that an occurrence is determined based on the effect of the accident. Annot., 64 A.L.R.4th 673–74 (1988). Finally, a third group of courts have concluded that an occurrence is determined by reference to the event or events triggering liability on the part of the insured. See, e.g., *In re Prudential Lines, Inc.*, supra, 158 F.3d 81; *Stonewall Ins. Co.* v. *Asbestos Claims Management Corp.*, supra, 73 F.3d

[19] As the court noted in *In re Prudential Lines, Inc.*, supra, 158 F.3d 82, "[i]t might be argued that if exposure is the occurrence, each period of exposure of each [c]laimant (or even each breath) is a separate occurrence." The defendants do not make this argument here. In any event, as explained later herein, "liability attaches following the first exposure; each [c]laimant's first exposure in the policy period is the final unfortunate event which causes injury, gives rise to the policyholder's potential liability, and triggers the policy; the [c]laimant's later exposures are a continuation of the same occurrence." Id., 82–83.

1213; *Babcock & Wilcox Co.* v. *Arkwright-Boston Mfg. Mutual Ins. Co.*, 53 F.3d 762, 767–68 (6th Cir. 1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 973, 133 L. Ed. 2d 893 (1996); *Maurice Pincoffs Co.* v. *St. Paul Fire & Marine Ins. Co.*, 447 F.2d 204, 206 (5th Cir. 1971); *Commercial Union Ins. Co.* v. *Porter Hayden Co.*, 116 Md. App. 605, 696, 698 A.2d 1167 (1997); *Hartford Accident & Indemnity Co.* v. *Wesolowski*, 33 N.Y.2d 169, 173, 305 N.E.2d 907, 350 N.Y.S.2d 895 (1973); *Arthur A. Johnson Corp.* v. *Indemnity Ins. Co. of North America*, supra, 7 N.Y.2d 228. Although Connecticut has very little case law addressing this precise issue; see *Providence Washington Ins. Group* v. *Albarello*, 784 F. Sup. 950, 953 (D. Conn. 1992) (applying Connecticut law; noting occurrence is unfortunate event causing bodily injury); *Mohawk Mountain Ski Area, Inc.* v. *American Home Assurance Co.*, Superior Court, judicial district of Litchfield, Docket No. 056905 (January 30, 1995) (in ruling on motion to set aside verdict awarding insurance proceeds to ski area for damage sustained in severe storm, court concluded that two tornados, striking within forty-five minutes of each other, could not constitute single occurrence as matter of law); there are a number of New York courts interpreting the term occurrence as used in policies with and without definitions of the term, that have adopted the event test.

In *Arthur A. Johnson Corp.* v. *Indemnity Ins. Co. of North America*, supra, 7 N.Y.2d 230, the New York Court of Appeals addressed how property damage caused by the collapse of two walls should be treated under a contractor's liability policy. The insured had built a wall in front of each of two adjoining buildings. During a heavy rainfall, both walls collapsed within fifty minutes of each other, causing property damage within the two buildings for which the policyholder was held liable. Id., 225–26.

The insurer in *Arthur A. Johnson Corp.* claimed that the damage to the two buildings resulted from a single accident within the meaning of the policy. Id., 226. The court expressly considered and rejected two tests in determining the number of accidents,[20] including the "negligent act or omission" test (a single occurrence for all injuries caused by the same negligent act) and the "effects" test. Id., 227–28. The court applied the "unfortunate event" test, reasoning that it was "the most practical of the three methods of construction . . . because it corresponds most with what the average person anticipates when he buys insurance and reads the 'accident' limitation in the policy." Id., 229; see also *Stonewall Ins. Co.* v. *Asbestos Claims Management Corp.*, supra, 73 F.3d 1213 ("In determining the number of occurrences . . . New York inquires whether multiple claims result from an event of an unfortunate character that takes place without one's foresight or expectation. . . . [A]lthough a single occurrence may give rise to multiple claims . . . courts should look to the event for which the insured is held liable, not some point further back in the causal chain." [Citations omitted; internal quotation marks omitted.]).

The court in *Arthur A. Johnson Corp.* v. *Indemnity Ins. Co. of North America*, supra, 7 N.Y.2d 230, concluded that the collapse of the two walls constituted two accidents because the property damage had occurred at separate times to separate buildings. The court stated: "[W]e need only point out that it is agreed that, during a heavy rainfall, a protecting wall collapsed under the water pressure and destruction poured into a building. Almost an hour later, another wall gave way and water flooded another building. There is no suggestion that the collapse of the first wall caused the failure of the second. . . . In addition, the catastrophe was not the

---

[20] As we have indicated previously, the terms "accident" and "occurrence" are synonymous. See footnote 14 of this opinion.

rain—that, in itself, did no harm. It was the breach of the wall letting the rain water in. Furthermore, *if the walls were located blocks away from each other on different job sites but subject to the same rainfall, no one could contest that there were two accidents.*" (Emphasis added.) Id.

In *Hartford Accident & Indemnity Co.* v. *Wesolowski*, supra, 33 N.Y.2d 171–73, the New York Court of Appeals, applying the "unfortunate event" test to an automobile insurance policy with "per occurrence" limits and no definition of occurrence, indicated the kind of facts that could give rise to a single occurrence. In *Wesolowski*, a motor vehicle traveling southbound at approximately fifty-five miles per hour had sideswiped a northbound vehicle, and then collided head-on with a second northbound vehicle. Id., 171. The court held therein that there was one occurrence because, unlike the fifty minute interval between the collapse of the two walls in *Arthur A. Johnson Corp.*, the two collisions "occurred but an instant apart," and "[t]he continuum between the two impacts was unbroken, with no intervening agent or operative factor." Id., 174.

In the present case, the decisions in both *Arthur A. Johnson Corp.* and *Wesolowski* direct this court to apply the event test in determining the number of occurrences under the policies.[21] Following their logic, we conclude that the exposures to asbestos constitute several occur-

---

[21] Metropolitan, however, in arguing that its negligent failure to warn was the single occurrence for all the injuries caused by the asbestos exposure, is essentially urging us to adopt the negligent act or omission test, which the New York Court of Appeals expressly rejected in *Arthur A. Johnson Corp.* In that case, the court rejected the notion that the negligent building of the walls constituted the occurrence. *Arthur A. Johnson Corp.* v. *Indemnity Ins. Co. of North America*, supra, 7 N.Y.2d 230. In the present case, the negligent failure to warn can be equated with the negligent building of the walls. While both may constitute the occurrence under the negligent act or omission test, they cannot constitute occurrences under the event test. See id.

rences. First, exposures did not occur "but an instant apart" as in *Arthur A. Johnson Corp.* Rather, they spanned a period of more than sixty years. Second, the continuum between the failure to warn and the claimants' ultimate injuries was not "unbroken" as required under *Wesolowski*. In fact, there were several "intervening agent[s]" involved; *Hartford Accident & Indemnity Co.* v. *Wesolowski*, supra, 33 N.Y.2d 174; including the manufacturers of the asbestos containing materials, those who installed the products, and the claimants' employers. In addition, the claimants exposed were located miles away from one another, on different job sites, and were exposed to different amounts of asbestos. The facts of this case are akin to those in *Arthur A. Johnson Corp.*, wherein "no one could contest" that there were several occurrences. *Arthur A. Johnson Corp.* v. *Indemnity Ins. Co. of North America*, supra, 7 N.Y.2d 230.

Metropolitan's claim that this court, in determining the number of occurrences, should ignore the immediate event that caused the claimants' injuries, and instead, look to an earlier event in the causal chain, has been rejected repeatedly by courts applying the event test. The two leading cases involving asbestos exposure that interpret the term occurrence in an insurance policy are *In re Prudential Lines, Inc.*, supra, 158 F.3d 65, and *Stonewall Ins. Co.* v. *Asbestos Claims Management Corp.*, supra, 73 F.3d 1178. See also *Babcock & Wilcox Co.* v. *Arkwright-Boston Mfg. Mutual Ins. Co.*, supra, 53 F.3d 767–68 (concluding that relevant event was exposure to asbestos, not more remote cause, such as plaintiff's failure to warn customers about dangers of asbestos).

In *Stonewall Ins. Co.*, an asbestos manufacturer faced multiple asbestos-related property damage claims resulting from the installation of its asbestos product in several different buildings. The insurance policy at

issue defined occurrence as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." (Internal quotation marks omitted.) *Stonewall Ins. Co.* v. *Asbestos Claims Management Corp.*, supra, 73 F.3d 1213. Relying upon New York cases that had interpreted the term occurrence without the benefit of a policy definition; see, e.g., *Champion International Corp.* v. *Continental Casualty Co.*, supra, 546 F.2d 502; *Uniroyal, Inc.* v. *Home Ins. Co.*, supra, 707 F. Sup. 1380–81; the Second Circuit determined that the occurrence was the installation of asbestos-containing materials, not the "general decision to manufacture asbestos . . . ." *Stonewall Ins. Co.* v. *Asbestos Claims Management Corp.*, supra, 1213; see also *Maryland Casualty Co.* v. *W.R. Grace & Co.*, 128 F.3d 794, 799 (2d Cir. 1997) (noting that occurrence was installation of asbestos). The court reasoned that, "courts should look to the event for which the insured is held liable, not some point further back in the causal chain." *Stonewall Ins. Co.* v. *Asbestos Claims Management Corp.*, supra, 1213. The court also concluded that the installation of asbestos in each building was a separate occurrence because "[e]ach installation created exposure to 'a condition which resulted in property damage neither expected nor intended from the standpoint of the insured,' and for each installation, there was a new exposure and another occurrence." Id. Moreover, the court noted that neither the policy language, nor case law provided a basis "for aggregating events widely separated in time and space into one 'occurrence.'" Id., 1214.

In *Stonewall Ins. Co.*, the Second Circuit distinguished its prior decision from two decades earlier in *Champion International Corp.* v. *Continental Casualty Co.*, supra, 546 F.2d 505–506, in which the court had determined that claims based on the installation

of defective vinyl panels in 1400 vehicles arose from a single occurrence, namely, the insured's delivery of the panels to the manufacturers of the vehicles. The court in *Stonewall Ins. Co.* stated: "In *Champion [International Corp.]*, the insured was exposed to liability merely because it had delivered the defective product; in this case, by contrast, [the insured's] liability, as reflected in the underlying complaints, results not from its delivery of asbestos-containing products, but rather from its manufacture of those products, resulting in the presence of [asbestos-containing] materials each time the products were installed on the property of third parties. Consequently, each location at which [the insured's] products are present, reflecting a separate installation of those products, is the site of a separate occurrence requiring imposition of another deductible." *Stonewall Ins. Co.* v. *Asbestos Claims Management Corp.*, supra, 73 F.3d 1214.

More importantly, the court in *Stonewall Ins. Co.* noted that *Champion International Corp.* had "declined to consider the possibility that each delivery of the product to a manufacturer might [have] constitute[d] a separate occurrence, because the [twenty-six] manufacturers had not sought indemnification from [the plaintiff]. Instead, [the court in *Champion International Corp.* had] limited [its] analysis to two possibilities: the 1,400 vehicles in which the products were installed, and what [it] viewed as a single delivery of the products. See [*Champion International Corp.* v. *Continental Casualty Co.*, supra, 546 F.2d 505]; see also [id., 507] (Newman, J., dissenting) (noting third possibility of [twenty-six] deliveries to different manufacturers); *Michigan Chemical Corp.* v. *American Home Assurance Co.*, [supra, 728 F.2d 383 n.10] ('[T]he court in *Champion [International Corp.]* did not advert to the possibility that [twenty-six] occurrences had taken place.')." *Stonewall Ins. Co.* v. *Asbestos Claims*

*Management Corp.*, supra, 73 F.3d 1213–14. Thus, the court in *Stonewall Ins. Co.* determined that *Champion International Corp.* did not require a ruling of one occurrence. Id.

In 1998, the Second Circuit extended the reasoning of *Stonewall Ins. Co.* to bodily injury claims, concluding that *exposure* to asbestos is the condition that creates liability for bodily injury. In *In re Prudential Lines, Inc.*, supra, 158 F.3d 68, approximately 5000 claimants alleged that they had suffered bodily injuries from exposure to asbestos while working aboard various ships over a fifteen year period. The trustee of the shipping line (Prudential), which had filed for bankruptcy, brought an action against its insurer seeking declaratory relief to clarify that insurer's indemnity obligations for the injury claims asserted against Prudential. Id., 67. The subject policies provided that personal injury claims were subject to a deduction in a stated amount " 'with respect to each accident or occurrence,' " but provided no definitions for the terms "accident" and "occurrence." Id., 76.

After concluding that the term occurrence was not ambiguous, the court noted that under New York law, "multiple injuries are grouped as a single 'occurrence' when they arise out of the same event of unfortunate character and occur close in time with no intervening agent." Id., 81. Applying this test, the court stated: "[A]ll asbestos-related bodily [injury] claims against Prudential resulting from exposure to asbestos on a particular ship cannot be attributed to a single occurrence. . . . Claimants seek to hold Prudential liable for bodily injury and the *last link in the causal chain leading to Prudential's liability for bodily injury was exposure to asbestos. Each [c]laimant was separately exposed to asbestos at different points in time. Therefore, the injuries arise from multiple occurrences.*" (Citations omitted; emphasis added.) Id.

In reaching its decision, the court in *In re Prudential Lines, Inc.*, was persuaded by the reasoning of a Maryland case in which the court had addressed the number of occurrences underlying multiple personal injuries from exposure to asbestos at the same location. See *Commercial Union Ins. Co.* v. *Porter Hayden Co.*, supra, 116 Md. App. 696. In particular, the court in *In re Prudential Lines, Inc.*, quoted the following language from *Commercial Union Ins. Co.*, wherein the court had relied on a California asbestos proceeding: "The common thread running through the . . . cases is that an occurrence or accident is associated with the time of injury. This leads to the conclusion that the cause of the injury which determines the number of occurrences undoubtedly refers to the immediate rather than the remote cause of injury. As the court stated in *Maples* [v. *Aetna Casualty & Surety Co.*, 83 Cal. App. 3d 641, 647–48, 148 Cal. Rptr. 80 (1978)] . . . [the] seemingly unbroken line of authority [in both California and out-of-state cases] find[s] that the term accident unambiguously refers to the event causing damage, not the earlier event creating the *potential* for future injury . . . . The event causing damage in the asbestos-related bodily injury cases is exposure to asbestos fibers . . . . Since each individual claimant has a unique work history, each claimant's exposure must be viewed as a separate occurrence." (Emphasis added; internal quotation marks omitted.) *In re Prudential Lines, Inc.*, supra, 158 F.3d 82; see also *Babcock & Wilcox Co.* v. *Arkwright-Boston Mfg. Mutual Ins. Co.*, supra, 53 F.3d 767 (holding that policy defining occurrence as " 'any happening or series of happenings, arising out of . . . one event' " meant that each claimant's exposure to asbestos was separate occurrence; rejecting insured's contention that decision to use asbestos in boilers was single occurrence).

The court in *In re Prudential Lines, Inc.*, supra, 158 F.3d 82–83, concluded that liability attached following

the first exposure; each claimant's first exposure in the policy period was the final unfortunate event that had caused injury, had given rise to the policyholder's potential liability, and had triggered the policy. Each claimant's later exposures were but a continuation of the same occurrence. Id., 83.

Applying the reasoning set forth in *Stonewall Ins. Co.* and *In re Prudential Lines, Inc.*, it becomes clear in this case that exposure to asbestos was the immediate event that caused the claimants' injuries. Indeed, the "last link in the causal chain" leading to Metropolitan's liability was the claimants' exposure to asbestos. Id., 81. Metropolitan's alleged failure to warn, while possibly a cause of the claimants' injuries, occurred earlier in the "causal chain," creating merely a "potential for future injury . . . ." (Internal quotation marks omitted.) Id., 82. Thus, if the claimants had never been exposed to the asbestos, there would have been no occurrence at all for which Metropolitan could have been held liable. But once the claimants were exposed, there was liability for any resulting damages. See *H. E. Butt Grocery Co.* v. *National Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, supra, 150 F.3d 534 (concluding that occurrence was not negligent supervision of employee alone, even if ongoing, since it would not trigger liability; exposure of boy to pedophilic employee was occurrence under insurance policy; finding multiple occurrences for each act of sexual abuse); *Maurice Pincoffs Co.* v. *St. Paul Fire & Marine Ins. Co.*, supra, 447 F.2d 206 (holding that under event test, occurrence, for which insured, who imported contaminated bird seed and later sold it to several dealers, was liable, was sale, rather than contamination since it was not act of contamination which subjected him to liability, and insurer's liability was not limited to single occurrence limit); *American Red Cross* v. *Travelers Indemnity Co. of Rhode Island*,

supra, 816 F. Sup. 761 (concluding that negligent practice in handling HIV-contaminated blood was not occurrence because negligence could not result in injury until particular unit of contaminated blood was provided to entity that would administer transfusion; finding separate occurrence for each distribution of contaminated blood).

Metropolitan attempts to distinguish *Stonewall Ins. Co.* and *In re Prudential Lines, Inc.*, from the present case by arguing that, because those cases did not contain a continuous exposure clause, they are not the proper authority on which to rely. In addition, Metropolitan contends in its brief that, "[t]he trial court's holding, if allowed to stand, would eliminate insurance under excess policies for virtually all mass tort claims, which typically involve multiple injuries arising out of a common cause and result in small payments per claim." Both contentions are without merit.

As the defendants correctly observed and noted in their brief, "in a case such as [*In re Prudential Lines, Inc.*], the addition of a 'continuous exposure' clause might have been significant, because it might have combined claims arising from exposure to asbestos on the same ship at roughly the same time." See *In re Prudential Lines, Inc.*, supra, 158 F.3d 82 n.9. In the present case, the appropriate analogy would be to combine claims originating at the same plant at approximately the same time. See *Endicott Johnson Corp.* v. *Liberty Mutual Ins. Co.*, 928 F. Sup. 176, 181 (N.D.N.Y. 1996) (holding that continuous exposure clause combined many instances of property damage *at each site* into one occurrence; viewing *Stonewall Ins. Co.* as "place-specific" decision). Thus, under the trial court's ruling,

many mass tort claims may be treated as a single occurrence.[22]

In the present case, however, as the trial court noted, "[we are] faced with a situation in which, according to the plaintiff, there is a single occurrence or, according to the defendants, there are separate occurrences for each underlying claim." *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 24 Conn. L. Rptr. 384. Neither party had claimed that the underlying claims originating at the same plant at roughly the same time should be combined under the continuous exposure clause.[23] Id., 383–84. Confronted with these choices, we are confident that a course of conduct spanning many decades is not a single occurrence as that term is used in the subject policies. "There is absolutely no case law to support such a proposition." Id., 384.

Metropolitan's theory of occurrence focuses on one federal district court decision: *Uniroyal, Inc.* v. *Home Ins. Co.*, supra, 707 F. Sup. 1368. That decision, however, predates both *Stonewall Ins. Co.* and *In re Pruden-*

---

[22] The defendants correctly have provided the following examples of mass tort claims that would be treated as a single occurrence under the trial court's decision: "[1] [I]f there is an airplane crash where there are likely to be multiple claims and injuries, there [would] be a single occurrence because the 'event of unfortunate character' is the accident or crash itself; [2] if co-workers at a plant are minimally exposed to radiation during a period of time, the 'continuous exposure' clause likely [would] combine the claims into a single occurrence; and [3] if hundreds of people are exposed to toxic chemicals from a single batch of bad soda cans, and there is a true 'batch' clause in the policy at issue, there [would] be a single occurrence." See *Norfolk & Western Ry. Co.* v. *Accident & Casualty Ins. Co. of Winterthur*, 796 F. Sup. 929, 937 (W.D. Va. 1992) (noting that, "[t]he typical single occurrence giving rise to multiple claims is the automobile accident which gives rise to a chain of events which results in injury to several parties"), aff'd in part, dismissed in part as moot, 41 F.3d 928 (4th Cir. 1994); id., 938 (analogizing automobile accident chain of events scenario to train wreck, where train was carrying toxic chemicals that spilled in heavily populated area).

[23] See footnote 12 of this opinion.

*tial Lines, Inc.*, and was criticized in *In re Prudential Lines, Inc.* In *Uniroyal, Inc.*, the court considered whether each spraying of "Agent Orange" in Vietnam was a separate occurrence or whether there was one single occurrence, "namely the negligent manufacture and failure to warn for which [the plaintiff] was potentially liable in the underlying suit." Id., 1380. Under the latter theory, the plaintiff in that case would have been subject to only one deductible, and thus, would have been entitled to coverage under the defendant's policy.

The court in *Uniroyal, Inc.*, rejected the theory that the exposure to Agent Orange was the occurrence on the basis that the exposure often had occurred concurrently with injury. Id., 1389. In *In re Prudential Lines, Inc.*, however, the Second Circuit questioned this reasoning, recognizing that the occurrence and the resulting injury "often occur actually or virtually together." *In re Prudential Lines, Inc.*, supra, 158 F.3d 81 n.8. In fact, the court noted that, "the proximity in time between the occurrence and the injury presented no problem in *Stonewall [Ins. Co.]*, in which . . . each installation constituted an occurrence even though the injury—property damage—also occurred immediately upon installation." Id. In addition, it is important to note that the court in *Uniroyal, Inc.*, also rejected the theory that the occurrence was the " 'negligent act or omission . . . .' " *Uniroyal, Inc.* v. *Home Ins. Co.*, supra, 707 F. Sup. 1382. In fact, the court expressly stated that, "[t]he 'unfortunate event' is evidently one of the several happenings, *with the exception of the negligent act or omission,* which precedes and contributes to the resulting injury." (Emphasis added.) Id. Thus, *Uniroyal, Inc.*, is of no help to Metropolitan under the facts of this case because its alleged failure to warn, although possibly one of the several happenings in this case, also constitutes a negligent omission.

As the defendants correctly note in their brief, many of the other authorities relied upon by Metropolitan are also of no precedential value because they are from jurisdictions that use the "cause test" in determining the number of occurrences, which both New York and Connecticut have rejected.[24] In fact, the court in *In re Prudential Lines, Inc.*, supra, 158 F.3d 81–82, expressly stated that its conclusion that, in bodily injury cases, each exposure to asbestos is the occurrence, "is consistent with the few cases that both (i) use an approach similar to New York's in defining 'occurrence' and (ii) have addressed the number of occurrences underlying multiple personal injuries from exposure to asbestos at the same location."[25]

Even the cause test, however, as applied to the facts of this case, would not dictate a finding of a single occurrence.[26] In *Norfolk & Western Ry. Co.* v. *Acci-*

[24] See *Appalachian Ins. Co.* v. *Liberty Mutual Ins. Co.*, supra, 676 F.2d 61 (adopting "cause" test); *Chemstar, Inc.* v. *Liberty Mutual Ins. Co.*, 797 F. Sup. 1541, 1546–47 (C.D. Cal. 1992) (expressly rejecting unfortunate event test and relying on underlying "cause" of property damage), aff'd, 41 F.3d 429 (9th Cir. 1994), cert. denied, 517 U.S. 1219, 116 S. Ct. 1847, 134 L. Ed. 2d 948 (1996); *Air Products & Chemicals, Inc.* v. *Hartford Accident & Indemnity Co.*, supra, 707 F. Sup. 772–73 (adopting "cause" test); *Owens-Illinois, Inc.* v. *Aetna Casualty & Surety Co.*, supra, 597 F. Sup. 1525 (same).

[25] See, e.g., *Babcock & Wilcox Co.* v. *Arkwright-Boston Mfg. Mutual Ins. Co.*, supra, 53 F.3d 767–68 (concluding that under event theory, each claimant's exposure to asbestos was separate occurrence; decision to use asbestos in boilers not single occurrence); *Commercial Union Ins. Co.* v. *Porter Hayden Co.*, supra, 116 Md. App. 696 (concluding that event causing damage in asbestos-related bodily injury cases is exposure to asbestos fibers since "the number of occurrences undoubtedly refers to the immediate rather than the remote cause of injury"); see also *American Red Cross* v. *Travelers Indemnity Co. of Rhode Island*, supra, 816 F. Sup. 761 (rejecting "level of generality . . . in applying the cause test" and determining each distribution of contaminated blood constituted separate occurrence). The court in *In re Prudential Lines, Inc.*, supra, 158 F.3d 82, also recognized that numerous jurisdictions recently had followed New York's lead, and rejected the "cause" test.

[26] "The general rule [under the cause test] is that an occurrence is determined by the cause or causes of the resulting injury. . . . Using this analysis, the court asks if [t]here was but one proximate, uninterrupted, and

*dent & Casualty Ins. Co. of Winterthur*, 796 F. Sup. 929, 937 (W.D. Va. 1992), aff'd in part, dismissed in part as moot, 41 F.3d 928 (4th Cir. 1994), a case involving a railroad's alleged negligence in failing to protect its employees from hazards of noise exposure, the court concluded that "[w]hile the railroad's negligence may indeed have been a cause of the injuries, calling that negligence the single occurrence out of which the [employees'] claims arose is nonsensical."[27] The court reasoned: "The railroad's argument allows the cause test to sweep too broadly and arrives at a result which defies common sense. Many different sounds damaged the hearing of many employees in many places over the course of many years, making this case one in which multiple occurrences created multiple injuries. For the purpose of interpreting the policy language, a relevant occurrence might be the generation of noise by a particular machine or by a number of machines in a particular physical plant. It may even be the railroad's negligence with regard to employees who work around a particular machine or in a particular plant. The occurrence contemplated by the language of the policies cannot logically be the railroad's system-wide negligence with respect to its employees, however. The railroad's argument is flawed to the extent that it *removes any limit* from the category of things which might be found to be a cause. *By moving the analysis of cause to a level sufficiently general to support an interpretation which*

continuing cause which resulted in all of the injuries and damages." (Internal quotation marks omitted.) *Appalachian Ins. Co.* v. *Liberty Mutual Ins. Co.*, supra, 676 F.2d 61. Applying this test, the defendants would still prevail because Metropolitan's alleged failure to warn, while possibly a cause of the claimants' injuries, was not one proximate, uninterrupted cause of the injuries, as evidenced by the fact that the injuries occurred at several different places over a period of sixty years.

[27] The policy at issue in that case defined occurrence as "one happening or series of happenings, arising out of or due to one event." *Norfolk & Western Ry. Co.* v. *Accident & Casualty Ins. Co. of Winterthur*, supra, 796 F. Sup. 932–33.

*would maximize coverage, the railroad has attempted to convert the cause test into a rubber stamp which would justify coverage in every case."* (Emphasis added.) Id. This, the court concluded, was a "misapplication of the cause test [that would lead] to an implausible interpretation of the occurrence language." Id. An implausible interpretation, the court noted, "may not be given effect, even under a rule which favors indemnity where contract language is ambiguous." Id.

*Norfolk & Western Ry. Co.* is analogous to the present case because both involve negligence as a possible "occurrence" under the subject insurance policies. As in *Norfolk & Western Ry. Co.*, while Metropolitan's negligence here may indeed have been a cause of the injuries, it would be nonsensical to conclude that, as a matter of law, that negligence constitutes the single occurrence out of which the 200,000 claims arose. Claimants were exposed to asbestos in several different places, in varying amounts, over the course of many years, making this case "one in which multiple occurrences created multiple injuries." Id. Under the cause test, each exposure was a separate occurrence that caused the claimants' injuries. Metropolitan's attempt to convert the cause test into a "rubber stamp" in order to maximize its coverage would "[remove] any limit from the category of things which might be found to be a cause" and would mandate coverage in every case. Id. Thus, even under the cause test, we are not persuaded that thousands of exposures to asbestos, occurring at different times and places, constitute one occurrence.

Finally, it is important to note that the holdings of many of the cases cited by Metropolitan were based on a finding that, absent a single occurrence construction, the insured would have been deprived of the coverage for which it had bargained and the insurance policies at issue would have been meaningless. See *International Surplus Lines Ins. Co.* v. *Certain Under-*

*writers & Underwriting Syndicates at Lloyds of London,* 868 F. Sup. 917, 921 (S.D. Ohio 1994); *Uniroyal, Inc.* v. *Home Ins. Co.,* supra, 707 F. Sup. 1386; *Air Products & Chemicals, Inc.* v. *Hartford Accident & Indemnity Co.,* supra, 707 F. Sup. 773; *Owens-Illinois, Inc.* v. *Aetna Casualty & Surety Co.,* supra, 597 F. Sup. 1527. This reasoning is inapplicable in the present case. First, such a "result-oriented approach" should be entertained only when the "per occurrence" language in the defendants' policies is ambiguous. *American Red Cross* v. *Travelers Indemnity Co. of Rhode Island,* supra, 816 F. Sup. 761 n.8. As we stated previously herein, the term occurrence is not ambiguous. Second, even if that term were ambiguous, the contra proferentum rule, which directs a court to interpret a policy against the insurer when ambiguous language cannot be resolved in favor of either party, is not appropriate in this case because both parties are insurance companies. *In re Prudential Lines, Inc.,* supra, 158 F.3d 77. Finally, the concern that a finding of multiple occurrences would render the defendants' insurance policies meaningless, simply is not present in this case. *Norfolk & Western Ry. Co.* v. *Accident & Casualty Ins. Co. of Winterthur,* supra, 796 F. Sup. 938. As we have explained, the continuous exposure clause acts to combine claims originating at the same plant at approximately the same time into one occurrence, thus covering most mass tort claims. "Absent a holding of [a] single occurrence, the policies at issue remain vital, meaningful agreements." Id.

The judgment is affirmed.

In this opinion the other justices concurred.